UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOE A. RODRIGUES and
ISABEL RODRIGUES,
        Plaintiffs,


        v.                                          CIVIL ACTION NO.
                                                    15-14254-GAO

OCWEN LOAN SERVICING, LLC; and
DEUTSCHE BANK NATIONAL TRUST COMPANY,
AS TRUSTEE FOR SOUNDVIEW HOME LOAN TRUST
2007-1 ASSET BACKED CERTIFICATES, SERIES
2007-1,
        Defendants.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS OCWEN LOAN SERVICING, LLC AND DEUTSCHE BANK NATIONAL**
**TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 55)**


**August 17, 2018**


**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by defendants Ocwen Loan Servicing, LCC ("Ocwen") and
Deutsche Bank National Trust Company, as Trustee for Soundview
Home Loan Trust 2007-1 Asset Backed Certificates, Series 2007-1
("DBNTC as Trustee"). (Docket Entry # 55). Plaintiffs Joe A.
Rodrigues ("Rodrigues") and Isabel Rodrigues ("plaintiffs")
oppose the motion in its entirety. (Docket Entry # 58). After
conducting a hearing, this court took the motion (Docket Entry #
55) under advisement.

PROCEDURAL BACKGROUND

Plaintiffs filed this action on December 28, 2015.  The amended complaint seeks injunctive relief and monetary damages against Ocwen and DBNTC as Trustee to prevent continuing foreclosure activity on their property in Raynham, Massachusetts and to offer a permanent modification to an existing mortgage loan upon proper calculations of payment.  (Docket Entry # 46). Plaintiffs seek actual and/or statutory damages, damages for emotional distress, exemplary and punitive damages, and compensation for the costs of this action, including the fees and costs of experts and reasonable attorney's fees.  (Docket Entry # 46).  The amended complaint sets out claims for fraud (Count I) and violation of the Massachusetts Consumer Protection Act, Massachusetts General Laws chapter 93A ("chapter 93A") (Count II).  (Docket Entry # 46).

Ocwen and DBNTC as Trustee ("defendants") seek summary judgment by asserting that plaintiffs fail to submit sufficient evidence to demonstrate common law fraud or liability under chapter 93A.  (Docket Entry # 56).  In addition to other arguments, defendants maintain that the claims arising from a 2011 HAMP[1] Agreement are time barred under the statute of limitations for fraud and chapter 93A.  (Docket Entry # 56).

---

[1]  HAMP is an acronym for the Home Affordable Mortgage Program. See generally Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 228

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  It is inappropriate "if the summary judgment record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction" and a "fact is 'material' when its (non)existence could change the case's outcome." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018); accord Green Mountain Realty Corp., 750 F.3d 30, 38 (1st Cir. 2014).  Facts are viewed in favor of the non-movants, i.e., plaintiffs.  See Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (court examines "'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in

(1st Cir. 2013) (quoting 12 U.S.C. § 5219(a)(1)) (internal ellipses omitted).

that party's favor'"); Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file" even if not cited by the parties.  Fed. R. Civ. P. 56(c)(3); Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014).  "'"[C]onclusory allegations, improbable inferences, and unsupported speculation"'" are ignored.  Garcia-Garcia, 878 F.3d at 417.

Under LR. 56.1, the moving party must "include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried" with citations to the record.  LR. 56.1.  As the opposing parties, plaintiffs must set out their own statement with citations to the record.  See LR. 56.1.  The rule deems admitted the facts in defendants' LR. 56.1 statement that plaintiffs' LR. 56.1 response does not controvert.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton School Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that plaintiff failed to controvert).  Adhering to this framework, the facts are as follows.

FACTUAL BACKGROUND

4

On October 15, 2002, plaintiffs purchased land located at 538 Elm Street E in Raynham, Massachusetts ("the property"). (Docket Entry # 57, ¶ 1) (Docket Entry # 59, p. 18, ¶ 1). Plaintiffs secured their first mortgage for the property on September 5, 2003 with a $275,000 loan from SLM Financial Corporation.  (Docket Entry # 57, ¶ 2) (Docket Entry # 57-2) (Docket Entry # 59, p. 19, ¶ 2).  On June 7, 2005, plaintiffs executed an additional mortgage on the property, a $100,000 home equity line of credit from Citibank Federal Savings Bank. (Docket Entry # 57, ¶ 2) (Docket Entry # 57-3, p. 7) (Docket Entry # 59, p. 19, ¶ 2).

On December 7, 2006, plaintiffs received the subject $475,000 mortgage loan ("the loan") from Mortgage Lenders Network, USA, Inc., designated as a nominee of Mortgage Electronic Registration Systems, Inc. ("MERS").  (Docket Entry # 57, ¶ 3) (Docket Entry # 57-7, ¶ 4) (Docket Entry # 59, p. 19, ¶ 3).  This loan was intended to refinance the original $275,000 loan and the subsequent $100,000 line of credit.  (Docket Entry # 57, ¶ 3) (Docket Entry # 59, p. 19, ¶ 3).  The $475,000 loan contained an adjustable rate balloon rider, a 30-year term and 50-year amortization, and a 5.8% initial interest rate through at least January 1, 2012.  (Docket Entry # 57, ¶ 4) (Docket Entry # 59, p. 19, ¶ 4).  The $475,000 loan proceeds were distributed as follows:  $355,348.96 to GMAC Mortgage to settle

and discharge the $275,000 loan, $100,640.93 to Citibank Mortgage to settle and discharge the $100,000 line of credit, $9,759.54 cash to plaintiffs, and $9,250.57 for settlement charges.  (Docket Entry # 57-7, ¶ 5).  The loan also required an escrow account to pay property taxes and hazard insurance premiums.  (Docket Entry # 57, ¶ 10) (Docket Entry # 59, p. 20, ¶ 10).

On January 30, 2007, Ocwen began servicing the loan. (Docket Entry # 57-7, ¶ 7).  DBNTC as Trustee currently owns the loan and is the holder of the promissory note evidencing it. (Docket Entry # 57-7, ¶ 9).

Citing financial hardship, plaintiffs defaulted on their monthly repayment obligations in July 2009.  (Docket Entry # 57, ¶ 11) (Docket Entry # 57-7, ¶ 10).  A "true and accurate copy of the transaction history for the Loan" indicates consistent delays in payments beginning in 2009 and continuing through 2010.[2]  (Docket Entry # 57-7, ¶ 10).  For instance, Ocwen's transaction history reflects that plaintiffs' April 2010 payment was not processed until July 1, 2010.  (Docket Entry # 57-7, ¶ 11) (Docket Entry # 57-7, p. 9).  Moreover, the history reveals that Ocwen did not receive the May 2010 payment until July 26, 2010.  (Docket Entry # 57-7, ¶ 11) (Docket Entry # 57-7, p. 10).

---

[2]  See footnote 14.

In examining the transaction history for the period of January
to September 2010, plaintiffs were consistently at least two
months late on their scheduled payments.  (Docket Entry # 57-7,
pp. 9-10).  An Ocwen account statement dated September 7, 2010
reflects a cumulative sum of $14,110.47 due.  (Docket Entry #
57-8, p. 1).  This sum included $9,798.72 in past due principal
and escrow payments, $3,264.59 in current principal, and
$1,047.16 in late fees.  (Docket Entry # 57-8, p. 1).

On September 27, 2010, Ocwen preliminarily approved
plaintiffs for a loan modification under HAMP.  (Docket Entry #
57-7, ¶ 12).  In order to successfully complete the
modification, plaintiffs were required to make three,
consecutive monthly payments under a trial period plan from
November 2010 to January 2011.  (Docket Entry # 57-8).  If all
three trial payments were successfully completed, plaintiffs
were to sign a Home Affordable Modification Agreement and
Balloon Disclosure ("2011 HAMP Agreement").  (Docket Entry # 57-
8).

The 2011 HAMP Agreement specifically stated that, upon
applying a $9,900.00 deferred balance to the $482,140.53 new
principal balance, the total principal due would be $472,240.53
at 2.00% interest.  (Docket Entry # 57-8).  The adjustable
interest rate would be subject to alterations after five years.
(Docket Entry # 57-8).  The accompanying balloon disclosure did

not specify an amount due at the mortgage term's conclusion. (Docket Entry # 57-8). In an account statement dated September 7, 2010, Ocwen informed plaintiffs that their total remaining principal balance due prior to the 2011 HAMP Agreement was $468,909.34. (Docket Entry # 57-8).

Ocwen transmitted the 2011 HAMP Agreement to plaintiffs on November 8, 2010. (Docket Entry # 57, ¶ 20) (Docket Entry # 59, p. 21, ¶ 20). The 2011 HAMP Agreement accounted for all outstanding amounts due, including the three trial payments to be submitted in the succeeding months. (Docket Entry # 57-7, ¶ 13). Plaintiffs successfully completed all three trial payments, and Ocwen received the signed 2011 HAMP Agreement on January 25, 2011. (Docket Entry # 57-7, ¶ 14). On January 27, 2011, Ocwen modified the loan. (Docket Entry # 57-7, ¶ 14).

Beginning on February 1, 2011, $1,430.07 of each payment was applied to both the principal and interest. (Docket Entry # 57-7, ¶ 15). For the payments dating from February 1, 2011 to May 1, 2013, Ocwen applied approximately $643.00 to $675.83 of each payment to the principal. (Docket Entry # 57-7, ¶ 15).

An Ocwen Loan Analyst ("the loan analyst") avers that from February 2011 to July 2013 Ocwen received only 28 regular monthly payments from plaintiffs, returning one to them. (Docket Entry # 57-7, ¶ 16). The transaction history reflects these payments. (Docket Entry # 57-7, pp. 11-12). Ocwen's

records indicate that plaintiffs remained one to two months behind on their regular monthly modified loan payments from November 2012 to June 2013.  (Docket Entry # 57-7, ¶ 16). Between July 26, 2013 and May 2, 2014, Ocwen did not record any new changes to the modified loan's outstanding balance that would have resulted from additional monthly payments.  (Docket Entry # 57-7, pp. 12-13).

By affidavit, Rodrigues avers that he "made 41 payments towards the modified loan between the [January] 2011 modification and the [July] 2014 modification."  (Docket Entry # 58, ¶ 3) (Docket Entry # 57-7, pp. 11-12).  The transaction history does not reflect all of the 41 payments Rodrigues made between the January 2011 HAMP Agreement and "the [July] 2014 Modification."  (Docket Entry # 58, ¶ 3) (Docket Entry # 57-7, pp. 11-12).  Drawing reasonable inferences in plaintiffs' favor, Ocwen received additional payments beyond the 28 it identifies in the transaction history.  (Docket Entry # 57-7, ¶ 16) (Docket Entry # 57-7, pp. 11-12).  A genuinely disputed material fact therefore exists regarding whether Ocwen received and correctly credited a number of payments that Rodrigues made during the January 2011 to July 2014 time period.

In correspondence dated February 19, 2014, Ocwen proposed the second modification to the mortgage, which included a Loan Modification Agreement and Balloon Disclosure ("2014

Modification Agreement"). (Docket Entry # 57-9). In an account statement dated December 17, 2013 that Ocwen sent to plaintiffs, Ocwen listed a current principal balance of $451,866.36 and a deferred principal amount of $9,900.00. (Docket Entry # 57-7, ¶¶ 16, 18) (Docket Entry # 57-9, p. 3). After applying the deferred principal balance of $9,900, the December 17, 2013 account statement discloses that the total principal owed leading up to the second modification was $461,766.36. (Docket Entry # 57-9, p. 3) (Docket Entry # 57-7, ¶ 18). The same statement also shows that plaintiffs paid $5,303.20 that Ocwen applied to interest and $4,707.29 that Ocwen applied to principal during the "year-to-date." (Docket Entry # 57-9, p. 3) (capitalization omitted). Ocwen also sent plaintiffs a February 17, 2014 account statement that disclosed the same principal ($451,866.36) and deferred principal ($9,900) figures. (Docket Entry # 57-9, p. 5).

To qualify for the 2014 Modification Agreement, plaintiffs needed to sign the agreement, submit a single down payment of $2,509.79 prior to April 1, 2014, and complete two subsequent trial period payments of $1,626.22 for May and June 2014. (Docket Entry # 57-9, p. 7). The agreement stated that the new principal balance following the trial period would be $472,823.93 with a 2.00% annual interest rate charged to the unpaid principal balance. (Docket Entry # 57-9, p. 9). The

attached balloon disclosure estimated that a $185,996.85 balloon payment would be due on the January 1, 2037 maturity date, subject to subsequent variation.  (Docket Entry # 57-10).

Plaintiffs successfully paid the three initial amounts and signed the 2014 Modification Agreement, which Ocwen received on June 30, 2014.  (Docket Entry # 57-7, ¶ 19).  On July 11, 2014, "the Loan was modified."  (Docket Entry # 57-7, ¶ 19). Following a recorded assignment on July 24, 2014, DBNTC as Trustee became the record holder of the mortgage.  (Docket Entry # 57-7, p. 7).

After the 2014 Modification Agreement, plaintiffs continued making adjusted monthly payments.  (Docket Entry # 57-7, pp. 13-14).  Their final, recorded, regular monthly payment was processed on April 17, 2015.  (Docket Entry # 57-7, p. 15).  On May 20, 2015, Ocwen transmitted an amortization schedule for the duration of the loan.  (Docket Entry # 57-10, pp. 2-11) (Docket Entry # 57-7, ¶ 21).  To date, the June 1, 2015 monthly payment is overdue, as are payments thereafter.  (Docket Entry # 57-7, p. 15).

From October 3, 2012 to May 31, 2017, Ocwen maintained a business operations office at 4 Technology Drive in Westborough, Massachusetts.  (Docket Entry # 57-7, ¶ 23).  From May 31 to October 31, 2017, Ocwen maintained another place of business also located in Westborough, Massachusetts.  (Docket Entry # 57-

7, ¶ 23).   Ocwen also maintains assets in Massachusetts through its Westborough offices and the recorded mortgages it maintains on real property located within the state.   (Docket Entry # 57-7, ¶ 23).

DBNTC as Trustee maintains places of business at One Beacon Street, One International Place, and 321 Summer Street, Suite 405 in Boston, Massachusetts.   (Docket Entry # 57, ¶ 44). Moreover, as the record holder of recorded mortgages on real property located in Massachusetts, DBNTC as Trustee also keeps assets within the state.   (Docket Entry # 57, ¶ 44).

<u>DISCUSSION</u>

I.   <u>Fraud</u>

The amended complaint identifies the following misrepresentations by Ocwen as the basis for the fraud claim: (1) the 2011 HAMP Agreement "misrepresented the principal balance as being $482,140.53," and the communications about the principal balance "every month thereafter are false and mathematically unsound" (Docket Entry # 46, ¶ 33(a);[3] (2) the

---

[3]   The fraud claim based on the principal amount is untimely for reasons stated in Roman numeral III.   Separately, plaintiffs provide no evidence to support the assertion that the principal amount is incorrect which, in turn, cannot support the additional assertion that the monthly statements thereafter are mathematically unsound.   The only evidence plaintiffs provide to support this latter portion of the claim consists of Rodrigues' 41 payments.   As such, the remaining portion of the above claim is fully encompassed within the next fraud claim (Docket Entry # 46, ¶ 33(b)).

2014 Modification Agreement "misrepresented the principal balance as $472,823.93" because Rodrigues made 41 payments between January 2011 and July 2014, and the communications every month thereafter regarding the principal balance are "false and mathematically unsound" (Docket Entry # 46, ¶ 33(b)); and (3) the representation of the balloon payment in the amount of $185,996.85 in the 2014 loan modification documentation is false and inaccurate (Docket Entry # 46, ¶ 33(c)). The amended complaint also alleges that these "misrepresentations and omissions" caused the loss of "thousands of dollars due to paying funds to a false princip[al]," an unjustifiable loss in equity in the property, the incurrence of legal fees, and reputational "slander" due to foreclosure proceedings. (Docket Entry # 46). In addition to the untimeliness of the fraud claim based on the 2011 HAMP Agreement, defendants move for summary judgment on the fraud claim because: (1) "[c]ontract terms," such as the express monetary amounts in the 2011 HAMP Agreement and the 2014 Modification Agreement, "are not statements of fact and cannot be construed as misrepresentations"; (2) plaintiffs provide no evidence to support that: (a) they made timely payments prior to the 2011 HAMP Agreement; (b) the principal

amount in the 2011 HAMP Agreement is inaccurate;[4] (c) plaintiffs
made 41 payments after the 2011 loan modification; (d) the
principal amount improperly increased after the 2011 loan
modification; and (e) the estimated balloon payment in the 2014
Modification Agreement is false; and (3) plaintiffs fail to
establish causation between the alleged injuries and the
misrepresentations.   (Docket Entry # 56).

        In order for a plaintiff to succeed on a common law fraud
claim in Massachusetts, the defendant must make a "knowingly
false statement concerning a material matter that was intended
to, and did in fact, induce the plaintiff's reliance and,
through that reliance, created an injury." Woods v. Wells Fargo
Bank, N.A., 733 F.3d 349, 357 (1st Cir. 2013); Russell v. Cooley
Dickinson Hosp. Inc., 772 N.E.2d 1054, 1066 (Mass. 2002).   In
order to survive summary judgment, plaintiffs alleging fraud
must come forth with credible evidence that establishes the
requisite elements of the fraud claim.   See In re Sheedy, 408
B.R. 204, 219 (Bankr. D. Mass. 2012); see also Hogan v. Riemer,
619 N.E.2d 984, 987-88 (Mass. App. Ct. 1993) (affirming summary
judgment for defendants on fraud claim partly because affidavits
and other evidence plaintiff presented "did not suggest fraud in

---

[4]  Arguments 2(a) and 2(b) pertain to the claim arising from the
2011 HAMP agreement which is untimely for reasons stated in
Roman numeral III.   Hence, it is not necessary to address them.

the sense that the content of the documents" presented during mortgage closing "was misrepresented").  Claims of fraud, misrepresentation, and other wrongful conduct will not circumvent summary judgment if they contain bald allegations or conjectures that are unsupported by the evidence.  See, e.g., Matt v. HSBC Bank, 968 F. Supp. 2d 351, 364 (D. Mass. 2013) (allowing summary judgment following plaintiff's failure to submit persuasive counter-argument or evidence to support intentional misrepresentation claim); Fernandes v. Havkin, 731 F. Supp. 2d 103, 117-18 (D. Mass. 2010) (awarding summary judgment to defendants because no evidence in the record suggested fraud or other unfair and deceptive conduct); Zuckerman v. McDonald's Corp., 35 F. Supp. 2d 135, 146 (D. Mass. 1999) (plaintiffs must do more than offer bald allegations or conjecture to avoid summary judgment on an intentional misrepresentation claim).

A.   Contract Terms as Statements of Fact

Citing two cases,[5] defendants submit that the monetary amounts of the principal and the balloon payment are contract terms in the 2011 HAMP Agreement and/or the 2014 Modification Agreement.  As such, they are not statements of fact and cannot

---

[5]   Secured Worldwide, LLC v. Kinney, No. 15 CIV. 1761(CM), 2015 WL 4469652, at *3 (S.D.N.Y. July 14, 2015) ("Secured"); and Klar v. Federal National Mortgage Assen, No. 3:13-CV-00462-JAG, 2014 WL 3101420, at *1 (E.D. Va. July 7, 2014) ("Klar").

be considered misrepresentations, according to defendants. (Docket Entry # 56).  Plaintiffs seek to distinguish Klar because the plaintiff in Klar argued that the defendants misrepresented how the terms in the loan Modification Agreement "would be enforced."  (Docket Entry # 58).  Plaintiffs further maintain that the fraud claim arises from incorrect mathematical calculations rather than only the express monetary terms in the 2011 HAMP Agreement and the 2014 Modification Agreement.  They also argue that the monthly statements contain the false amounts of principal and, consequently, the misrepresented principal amount is not only contained in the 2011 and 2014 agreements.[6] (Docket Entry # 58).

     Here, the argument that the principal amount in the 2014 Modification Agreement is not a misrepresentation of fact but, instead, a contract term does not provide a basis for summary judgment on the fraud claim because plaintiffs correctly point out that, in any event, defendants misrepresented the principal amount in the monthly billing statements.  In the alternative, the two cases cited by defendants are distinguishable because they do not apply Massachusetts law.

---

[6]  Plaintiffs' additional argument based on Fed. R. Civ. P. 9(b) ("Rule 9(b)") and that "Defendants' [sic] complaint satisfies that standard" (Docket Entry # 58) is not relevant.  Defendants do not raise a Rule 9(b) argument in the summary judgment motion.

In addition, Klar is distinguishable because it involved a "mortgage modification agreement [that] contained specific monthly principal and escrow payments" and, unlike the case at bar, Klar asserted he only had to pay those amounts that the agreement contained.  Klar v. Federal National Mortgage Assen, 2014 WL 3101420, at *1 (plaintiff "contend[ed] that these specific payments for principal and escrow [were] the only amounts he ha[d] to pay under the modification agreement" and that defendants engaged in fraud because they later requested "larger principal and escrow payments from" him).  Here, in contrast, plaintiffs maintain that the figures in the agreement are incorrect based on the incorrect principal stated in the 2014 Modification Agreement.

The Secured decision is also distinguishable.  The portion of the opinion that defendants cite reads as follows:

> Kinney's fraud claim is equally deficient with respect to Lieberman.  Kinney claims that Lieberman induced Zoccolillo to make changes to the LLC agreement.  (Compl.¶ 64.)  But the terms of the LLC agreement are not misrepresentations.  They are simply contract terms.  They are not confusing and are written in plain English.  *There is no allegation that the contract itself contains any misrepresentation in its text.*

Secured Worldwide, LLC v. Kinney, No. 15 CIV. 1761(CM), 2015 WL 4469652, at *3 (emphasis added).  The alleged fraud consisted of Kinney relying on an extra-contractual statement by an attorney "that he was representing 'the Company' as an assurance that"

17

the attorney "was protecting the rights *of each member of the company*," a category that would include Kinney.  Id. at *1, *3 (also noting Kinney was "a member and former employee of Secured" and the attorney was Secured's attorney) (emphasis in original).  Here, plaintiffs are not arguing that Ocwen induced them to enter into the 2014 Loan Modification Agreement. Rather, they contend that the agreement itself includes a factual misrepresentation, namely, the amount of the incorrect principal balance and the balloon payment.

Finally, defendants' brief assertion that plaintiffs "fail to identify any false representation of fact on which they claim to have relied" is not adequately developed.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief").  While there *may* be viable arguments to dismiss the claim, defendants do not identify or develop them.  Without more, defendants' argument based on an inability to bring the fraud claim because the principal amount in the 2014 Modification Agreement is a contract term that cannot constitute a misrepresentation of fact does not warrant summary judgment.

B.  Insufficient Evidence

As noted previously, defendants move for summary judgment because plaintiffs fail to provide sufficient evidence to

support the fraud allegations that pertain to the principal
amount in the 2011 HAMP Agreement[7] and the 2014 Modification
Agreement.  (Docket Entry # 56).  In particular as to the 2014
Modification Agreement, defendants submit that plaintiffs made
28 payments from February 2011 to July 2013 and that plaintiffs'
allegation that the principal amount improperly increased after
the 2011 HAMP Agreement is false.  (Docket Entry # 56).  With
respect to the purportedly inaccurate principal and balloon
payment figures in the 2014 Modification Agreement, Ocwen
provides detailed account information related to the
modification.  (Docket Entry ## 57-7, 57-8).  Of particular
note, Ocwen supplied a comprehensive transaction history of the
loan dating back to 2006.[8]  (Docket Entry # 57-7, pp. 8-15).
This transaction history indicates delays in plaintiffs'
mortgage payments beginning as early as July 2009 and it denotes
that plaintiffs made only 28 payments between the 2011 HAMP
Agreement and the 2014 Modification Agreement.  (Docket Entry #
57-7).  The 2014 Modification Agreement explicitly notes that
the estimated balloon payment is due on January 1, 2037.
(Docket Entry # 57-9, pp. 2, 11) (Docket Entry # 57-10).  The
balloon disclosure signed by plaintiffs on June 30, 2014

---

[7]  The untimeliness of the fraud claim based on the 2011 HAMP
Modification obviates the need to address this alternative basis
to dismiss the claim.
[8]  See footnote 14.

disclosed the "estimated balloon payment" of $185,996.85 "due in a single payment on" January 1, 2037. (Docket Entry # 57-10, p. 1). The Ocwen loan analyst states by affidavit that the balloon disclosure accurately discloses the estimated balloon payment. (Docket Entry # 57-7, p. 5). The attached amortization schedule sets out the monthly balances calculated from a beginning principal balance in the purportedly false amount of $472,823.93 as of July 1, 2014 and includes the January 1, 2037 balance of $185,996.85. (Docket Entry # 57-10, pp. 2, 8). In other words, the estimated balloon payment is calculated based on the purportedly false principal amount of $472,823.93.

Plaintiffs, however, submit countervailing evidence that challenges the accuracy of Ocwen's transaction records. (Docket Entry # 58). Specifically, the evidence calls into question the number of payments that plaintiffs completed between the 2011 HAMP Agreement and the 2014 Modification Agreement.[9] (Docket Entry # 58, ¶ 3). This affidavit runs contrary to the evidence that defendants submit, thus creating an issue of material fact as to the accuracy of the principal amount in the 2014 Modification Agreement and the estimated balloon payment based

---

[9] Rodriguez also avers that he "only missed a couple payments prior to" the 2011 HAMP Agreement. (Docket Entry # 58, ¶ 2). As explained in Roman numeral III, the miscalculations, if any, regarding the amounts in the 2011 HAMP Agreement are time barred.

on that principal amount.  Summary judgment on the basis of
defendants' second argument therefore lacks merit for the fraud
claims that are not time barred.

C.  Causation

Defendants next contend that plaintiffs cannot prove a
cognizable injury that resulted from their reliance on these
misrepresentations.  (Docket Entry # 56).  Citing Kiluk v.
Select Portfolio Servicing, Inc., Civil Action No. 11-10731-FDS,
2011 WL 8844639, at *5 (D. Mass. Dec. 19, 2011), they primarily
argue that making modified mortgage payments does not satisfy
the required causation.  (Docket Entry # 56).  Because injury is
an essential element for this cause of action, defendants submit
that the fraud claim cannot survive summary judgment.  (Docket
Entry # 56).

A fraudulent misrepresentation claim requires "an
actionable injury caused by . . . [the] alleged false
statement."  Shaulis v. Nordstrom, Inc., 865 F.3d 1, 15 (1st
Cir. 2017).  "Specifically, under Massachusetts law, a claim for
fraudulent misrepresentation requires a pecuniary loss."  Id.
(citing Twin Fires Inv., LLC v. Morgan Stanley Dean Witter &
Co., 837 N.E.2d 1121, 1135-36 (Mass. 2005)); accord Kiluk v.
Select Portfolio Servicing, Inc., 2011 WL 8844639, at *5
(stating that plaintiffs must suffer "a pecuniary loss as a
consequence of their reliance on defendant's alleged

misrepresentation"). The injury that a plaintiff incurs must naturally flow from the defendant's alleged misconduct. <u>Reisman v. KPMG Peat Marwick LLP</u>, 787 N.E.2d 1060, 1068-69 (Mass. App. Ct. 2003) (citing and quoting <u>David v. Belmont</u>, 197 N.E. 83, 85 (Mass. 1935)); <u>see also</u> <u>Kiluk v. Select Portfolio Servicing, Inc.</u>, 2011 WL 8844639, at *5 (noting in context of adjudicating negligent misrepresentation claim that plaintiffs must suffer "a pecuniary loss as a consequence of their reliance on defendant's alleged misrepresentation"). The court in <u>Kiluk</u> provides that modified mortgage payments that plaintiffs have a contractual obligation to complete, however, "do not constitute a pecuniary harm." <u>Kiluk v. Select Portfolio Servicing, Inc.</u>, 2011 WL 8844639, at *5.

Plaintiffs argue that the injury caused by the false statements of the principal consists of making payments that were greater than the contractually obligated amount. (Docket Entry # 58). In other words, the misrepresentation regarding the amount of the principal in the billing statements and the 2014 Loan Modification compelled plaintiffs to make payments above and beyond what they were obligated to make.[10] (Docket

---

[10] This agreement pertains to the fraud claim based on the misrepresentations of the principal amount in the 2014 Modification Agreement and every month thereafter because Rodrigues made 41 payments "between January 2011 and July 2014." (Docket Entry # 46, ¶ 33(b)). The fraud claim based on the 2011 HAMP Agreement (Docket Entry # 46, ¶ 33(a)) is time barred as

Entry # 58).  Plaintiffs therefore aptly distinguish <u>Kiluk</u> on the basis that it concerned payments the plaintiff was contractually obligated to make as opposed to the higher payments the plaintiff made based on the false principal amounts in the monthly billing statements and the 2014 Loan Modification Agreement.  (Docket Entry # 58).

Rodrigues' affidavit creates a question of fact as to whether or not plaintiffs were obligated to make the monthly payments under the loan modification agreements.  (Docket Entry # 58, ¶ 3).  He attests that he made 41 payments between the 2011 HAMP Agreement and the July 2014 Loan Modification (Docket Entry # 58, ¶ 3), as opposed to the 28 payments reflected in the loan transaction history.  In light of Ocwen's failure to credit the additional payments as evidenced in the transaction history, a reasonable jury could find that plaintiffs made monthly payments higher than the amount actually owed.[11]  A reasonable jury could further conclude that plaintiffs made payments after the 2014 Modification Agreement based on the inflated principal

---

explained in Roman numeral III.  As explained below, the record provides no evidence that plaintiffs suffered a pecuniary injury caused by the purported misrepresentation of the amount of the balloon payment.  Indeed, there is no evidence that plaintiffs made any payment on part or all of the misrepresented $185,996.85 balloon payment.

[11]  Payments made after December 28, 2012 would be within the three-year limitations period for fraud inasmuch as plaintiffs filed this action on December 28, 2015.

and that such payments naturally flow from the false representation of the amount of the principal balance. (Docket Entry # 57-7, p. 14) (transaction history reflecting regular payments in October, November, and December 2014). Accordingly, plaintiffs established the necessary pecuniary loss caused by the false, inflated principal amounts in the monthly billing statements and the 2014 Modification Agreement to withstand summary judgment. See Shaulis v. Nordstrom, Inc., 865 F.3d at 15; Kiluk v. Select Portfolio Servicing, Inc., 2011 WL 8844639, at *5; Reisman v. KPMG Peat Marwick LLP, 787 N.E.2d at 1068; David v. Belmont, 197 N.E. at 85.

There is, however, no evidence that plaintiffs suffered an actionable injury caused by the purportedly false and inaccurate representation of a balloon payment in the amount of $185,996.85. The balloon payment was not due until the January 1, 2037 maturity date. (Docket Entry # 57-8, p. 6). There is no evidence that plaintiffs made a payment on the balloon amount let alone a payment caused by the false statement of the estimated balloon payment. With defendants having pointed to an absence of evidence regarding injury and causation, it was incumbent upon plaintiffs as the summary judgment targets to submit evidence of an actionable injury. Although plaintiffs allege that they incurred legal fees, they do not provide any evidence of such fees. They also do not cite any legal

24

authority that attorneys' fees incurred to litigate a fraud claim constitute a compensable injury under a fraud claim. They also provide no evidence to support the existence of "a lien of an illegitimate amount to improperly reduce the property's equity" (Docket Entry # 58, p. 10) caused by the purportedly false statement of an inflated, estimated balloon payment.

In sum, with respect to the fraud claim that is not time barred,[12] plaintiffs submit sufficient evidence of a pecuniary injury to survive summary judgment *except* for the claim based on the false statement or misrepresentation vis-à-vis the balloon payment.

I.   <u>Chapter 93A</u>

The chapter 93A claim rests on the same three mathematically inaccurate misrepresentations as the fraud claim. (Docket Entry # 46, ¶¶ 33(a)-(c), 42(a)-(c))). In addition to the untimeliness of the chapter 93A claim based on the 2011 HAMP Agreement, defendants move for summary judgment on the chapter 93A claim because:  (1) plaintiffs did not furnish defendants with the requisite pre-suit demand letter that identifies the unfair and deceptive trade practices; (2) plaintiffs fail to submit sufficient facts to support a valid chapter 93A claim; (3) plaintiffs fail to identify the unfair and deceptive conduct

---

[12]   See Roman numeral III.

that would violate chapter 93A; and (4) plaintiffs fail to show

an actionable economic injury.  (Docket Entry # 56).

A.  Demand Letter

In filing the original complaint, plaintiffs did not send

defendants a demand letter.  (Docket Entry # 46, ¶ 39)

("Plaintiff[s] did not send Ocwen a demand letter").[13]  They

maintain that a demand letter is not required pursuant to

section 9(3) of chapter 93A.  (Docket Entry # 46, ¶¶ 39-40)

(Docket Entry # 58).

Chapter 93A "proscribes 'unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any

trade or commerce.'"  Juarez v. Select Portfolio Servicing,

Inc., 708 F.3d 269, 280 (1st Cir. 2013) (quoting chapter 93A,

section two).  The statute requires plaintiffs to mail or

deliver a demand letter to defendants at least 30 days before

---

[13]  Plaintiffs' contention that Ocwen admits that the original
complaint describes a demand that plaintiffs made before
commencing this action is disingenuous.  First, the motion for
judgment on the pleadings argued precisely the opposite, namely,
that plaintiffs did not make a pre-suit demand to Ocwen within
the meaning of the statute.  (Docket Entry # 16, pp. 13-15).
Second, the relevant statements by Ocwen in the filing recite
plaintiffs' statement in the original complaint as an
allegation, which is not a statement of fact.  (Docket Entry #
16, p. 14) ("Plaintiff *alleges* that he [']made demands to Ocwen
for relief and . . . *alleges* only that . . .'") (emphasis
added).  Ocwen's statement in the filing therefore falls
decidedly short of an admission.  Third, unverified statements
in a complaint are not part of the summary judgement record.
Cf. Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1st Cir. 1991).

filing an action.  Mass. Gen. Laws ch. 93A, § 9(3); McKenna v.
Wells Fargo Bank, N.A., 693 F.3d 207, 217 (1st Cir. 2012).  The
demand letter must be "'a written demand for relief, identifying
the claimant and reasonably describing the unfair or deceptive
act or practice relied upon and the injury suffered.'"  Bulmer
v. MidFirst Bank, FSA, 59 F. Supp. 3d 271, 281 (D. Mass. 2014)
(quoting chapter 93(A), section 9(3)).  Moreover, the
requirement "is not merely a procedural nicety, but, rather, 'a
prerequisite to suit.'"  Rodi v. S. New Eng. Sch. Of Law, 389
F.3d 5, 19 (1st Cir. 2004) (quoting Entrialgo v. Twin City
Dodge, Inc., 322 N.E.2d 202, 204 (Mass. 1975)).  The requirement
serves an important practical function by encouraging
"'negotiation and settlement,'" and it is also intended to serve
"'as a control on the amount of damages.'"  McKenna v. Wells
Fargo Bank, N.A., 693 F.3d at 218 (quoting Slaney v. Westwood
Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975)).  Given its
essential role of placing a party on notice for a potential
impending lawsuit, the absence of a pre-suit demand letter is
"fatal to [any] plaintiff's Chapter 93A claim."  Brown v. Bank
of America Corp., Civil Action No. 10-11085-GAO, 2011 WL
1311278, at *1, 3 (D. Mass. Mar. 31, 2011).

    There are two notable exceptions to this general rule.  See
McKenna v. Wells Fargo Bank, N.A., 693 F.3d at 218.  Prospective
plaintiffs are excused from complying with the pre-suit demand

letter requirement "if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business *or* does not keep assets within the commonwealth."  Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added).

Plaintiffs rely on the second exception.  They do not, however, address the second exception as it applies to DBNTC as Trustee in their opposition (Docket Entry # 58, pp. 10-11) and never elaborate upon the amended complaint's assertion, "[u]pon information and belief," that DBNTC as Trustee does not keep or maintain assets or a place of business in Massachusetts. (Docket Entry # 46, ¶ 38).  Plaintiffs do, however, argue that they are exempt from sending Ocwen a demand letter under the second exception.  (Docket Entry # 58).

Plaintiffs correctly follow the statutory interpretation set forth in Moronta v. Nationstar Mortg., LLC, 64 N.E.3d 1287, 1289-90 (Mass. 2016), which reads the chapter 93A demand letter exception clause in the disjunctive, rather than the conjunctive, form.  The Massachusetts Supreme Judicial Court ("SJC") in Moronta held that a plaintiff was not required to serve a demand letter on defendants that kept assets in the Commonwealth, but maintained no place of business there.  Id. Interpreting the language in section 9(3), the SJC excused the plaintiff "from serving a demand letter if the prospective

respondent *either* lacks a place of business in Massachusetts *or* does not keep assets in Massachusetts." Id. at 1290 (emphasis added).

Examining the exception as it applies to DBNTC as Trustee, it operates in three different locations in Boston as shown on its website. (Docket Entry # 57-4, p. 4). In light of the absence of evidence to the contrary, DBNTC as Trustee therefore maintains one or more places of business within Massachusetts. DBNTC also has an asset in Massachusetts as the owner of the mortgage. (Docket Entry # 57-7, p. 7); see Sumner v. Mortg. Elec. Registration Sys., Inc., No. 11-11910-DJC, 2012 WL 3059429, at *1, 7 (D. Mass. Jul. 26, 2012) (dismissing chapter 93A claims for failure to submit demand letter since defendant's "ownership of [p]laintiff's mortgage constitutes an asset located in Massachusetts," thus making the demand letter exception "inapplicable"); Okoye v. Bank of N.Y. Mellon, No. 10-11563-DPW, 2011 WL 3269686, at *1, 4 (D. Mass. Jul. 28, 2011) (noting that a single "recorded mortgage secured by real property located in the Commonwealth is an 'asset[] within the commonwealth' for the purposes of chapter 93A").

In the alternative, plaintiffs fail to address the section 9(3) exception as it applies to DBNTC as Trustee and therefore waive the argument that DBNTC did not maintain a place of business or keep assets within Massachusetts under section 9(3).

See Vallejo v. Santini-Padilla, 607 F.3d 1, 7 & n.4 (1st Cir. 2010); Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).  Plaintiffs' additional argument that the purpose of the demand letter requirement is satisfied because the complaint itself provides enough notice of the allegations against them (Docket Entry # 58, p. 11) is not convincing.  If true, the argument would eviscerate the demand letter requirement in every action in which a plaintiff files a complaint that gives notice of the chapter 93A misconduct.  See also In re Mitchell, 476 B.R. 33, 59 (Bankr. D. Mass. 2012) (argument based on "spirit of Chapter 93A" to waive demand letter requirement did not justify a departure from the requirement).  Moreover, the complaint does not satisfy the demand letter requirement because the demand letter is sent prior to the time a prospective plaintiff files suit.  Mass. Gen. Laws ch. 93A, § 9(3).

In sum, as to DBNTC as Trustee, plaintiffs are not excused from serving a pre-suit demand letter on DBNTC as Trustee because it maintains one or more places of business and has an asset within Massachusetts.  Summary judgment on the chapter 93A claim due to the absence of a demand letter is therefore warranted as to DBNTC as Trustee.

With respect to Ocwen, plaintiffs contend that Ocwen did not maintain a place of business in Massachusetts, which thereby excuses them from the demand letter requirement.  (Docket Entry

# 58).  Turning to the evidence in the record as to Ocwen, a sworn affidavit from the Ocwen loan analyst reveals that throughout the servicing of the loan, Ocwen retained locations of business in Westborough, Massachusetts.  (Docket Entry # 57-7, ¶ 23).  The loan analyst avers that:

> From October 3, 2012 to May 31, 2017, Ocwen maintained a place of business comprised of an approximately 18,158 square foot business operations office at 4 Technology Drive, Westborough, Massachusetts.  From May 31, 2017 to October 31, 2017, Ocwen maintained a place of business at another location in Westborough, Massachusetts.[14]

---

[14]  Plaintiffs challenge the ability of the loan analyst to attest "to the mathematical calculations regarding the 2011 and 2014 loan modification agreements."  (Docket Entry # 58, p. 5).  The loan analyst for Ocwen who is familiar with Ocwen's business records, however, avers that he "personally examined" the business records of Ocwen, which were made at or near the time of the transactions by a person with knowledge of the transactions and such records "are kept in the regular course of business activity."  (Docket Entry # 57-7, ¶¶ 1-3).  Overall, the averment satisfies the business records exception to the hearsay rule as to the mathematical calculations plaintiffs challenge.  See, e.g., Brown v. Bank of Am., Civil Action No. 13-13256-PBS, 2015 WL 5163045, at *3 (D. Mass. Sept. 3, 2015) (concluding that bank official's strikingly similar averment satisfied business records exception in mortgage loan dispute; noting official "is 'familiar with the types of records maintained by BANA in connection with mortgage loans serviced by BANA and/or its predecessor, . . . reviews BANA's business records,'" and "'personally . . . confirmed the facts'") (citing Foregger v. Residential Credit Sols., Inc., Civil Action No. 12-11914-FDS, 2014 WL 1364788, at *4 (D. Mass. Apr. 4, 2014)); Foregger v. Residential Credit Sols., Inc., 2014 WL 1364788, at *4 (rejecting challenge to bank official's lack of personal knowledge in reviewing records); see also Wallace Motor Sales, Inc. v. American Motors Sales Corporation, 780 F.2d 1049, 1061 (1st Cir. 1985); NLRB v. First Termite Control Co., Inc., 646 F.2d 424, 429 (9th Cir. 1981).
    Plaintiffs do not challenge the ability of the loan analyst to attest to the locations and places of business in Massachusetts from October 2012 to October 2017.  (Docket Entry

(Docket Entry # 57-7, ¶ 23).  The time period for mailing or delivering the demand letter is "[a]t least thirty days prior to filing" the action.  Mass. Gen. Laws ch. 93A, § 9(3).  November 28, 2015 is 30 days prior to the date plaintiffs filed suit on December 28, 2015.  Construing the record in plaintiffs' favor, the foregoing averment by the loan analyst does not infer that Ocwen had a place of business in Massachusetts between November 1 and November 28, 2015.

To support the argument that Ocwen does not maintain a place of business within Massachusetts, plaintiffs submit a "Business Entity Summary" provided through the Secretary of the Commonwealth of Massachusetts' website.  (Docket Entry # 58, p. 27).  Dated January 17, 2018, the report shows that Ocwen had a resident agent with a Boston address as of January 17, 2018 and a principal office in Florida.  (Docket Entry # 58, p. 27).  Because Ocwen maintained a place of business in Massachusetts up

---

# 57-7, ¶ 23).  As to Ocwen's locations, places of business, and assets, plaintiffs therefore waive any argument that the averment in paragraph 23 constitutes hearsay or otherwise fails to comply with Rule 56(c)(4).  See Bellone v. Southwick-Tolland Regl. Sch. Dist., 748 F.3d 418, 421 n.2 (1st Cir. 2014) (rejecting argument that summary judgment affidavit included hearsay and explaining that, "because Bellone did not raise any objection to the affidavit below, the district court was free to consider it"); Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief"); Vallejo v. Santini-Padilla, 607 F.3d 1, 7, n.4 (1st Cir. 2010); see also Merrimon v. Unum Life Ins. Co. of America, 758 F.3d 46, 57 (1st Cir. 2014).

until October 31, 2017, the issue as to whether it maintains a place of business within the meaning of section 9(3) reduces to whether the statute requires it to also maintain a place of business at or shortly before November 29, 2015, i.e., the date that is 30 days before plaintiffs filed suit on December 28, 2015.  The parties do not direct this court to any case law interpreting this aspect of section 9(3).

Statutory interpretation "always starts with the language of the statute itself."  Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) (interpreting Massachusetts law).  It is also well settled that the "'primary duty in interpreting a statute is "to effectuate the intent of the Legislature."'" Spencer v. Civil Serv. Comm'n, 93 N.E.3d 840, 845 (Mass. 2018). When "'the language of a statute is plain and unambiguous it is conclusive as to legislative intent.'"  Id.; accord Dorrian v. LVNV Funding, LLC, 94 N.E.3d 370, 375 (Mass. 2018) (when "'words are "plain and unambiguous" in their meaning, we view them as "conclusive as to legislative intent"'"); Matamoros v. Starbucks Corp., 699 F.3d at 134 ("[w]e assume that the ordinary meaning of the statutory language expresses the legislature's intent"). "[T]he literal meaning of the words," however, is not accepted "without regard for that statute's purpose and history." Spencer v. Civil Serv. Comm'n, 93 N.E.3d at 845-46 (citations omitted).  If "the meaning of a statute is not readily apparent

from its language," the court ascertains the Legislature's intent "'from all its words considered in connection with the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.'" Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 22 (1st Cir. 2018) (ellipses omitted); Moronta v. Nationstar Mortg., LLC, 64 N.E.3d at 1289.

The language of section 9(3) requires plaintiffs to mail or deliver a demand letter "[a]t least thirty days prior the filing of" an action under chapter 93A, section nine.  Mass. Gen. Laws ch. 93A, § 9(3).  The same paragraph further states that the demand letter requirement, which includes mailing the letter at least 30 days prior to filing suit, "shall not apply . . . if the prospective respondent does not maintain a place of business . . . within the commonwealth . . . ."  Mass. Gen. Laws ch. 93A, § 9(3).  The plain and ordinary meaning of "maintain" is "[t]o continue something" such as "[t]o continue in possession of property, etc."  Black's Law Dictionary (10th ed. 2014) (parentheses omitted).  In this instance, the plain and ordinary meaning of "maintain" is to continue a place of business in Massachusetts at least 30 days prior to the time the plaintiff files suit.  The use of the present tense to "maintain a place of business" as opposed to "maintained" a place of business

lends additional credence to interpreting the language as having
a place of business at and around the time the demand letter is
required, namely, at least 30 days before suit is filed.

In addition, the purpose and legislative intent for the
demand letter requirement is "to encourage settlement of
disputes and to limit damages, not to place an arbitrary
obstacle in the consumer's path." Moronta v. Nationstar Mortg.,
LLC, 64 N.E.3d at 1290. Here, interpreting the statute to
include the latest date when the demand letter is required,
i.e., at or shortly before 30 days prior to suit, does not place
an arbitrary obstacle in plaintiffs' path. Rather, it better
enables plaintiffs' access to the remedies provided in chapter
93A. See id. ("interpret[ing] the statute to enable consumers'
access to the remedies provided by G.L. c. 93A, not to frustrate
it"). Adhering to the admonition to interpret the remedial
statute broadly and avoid an interpretation that frustrates a
consumers' access to the remedies in section nine, this court
concludes that the relevant time period for Ocwen to maintain a
place of business within Massachusetts *includes* the time period
at and around the time period plaintiffs had to mail or deliver
the letter, i.e., at least 30 days prior to December 28, 2017.[15]

_____

[15]  It is not necessary to determine whether the time period also
includes the time period when Ocwen serviced the mortgage and
engaged in the purported misconduct because there is no evidence

Thus, even assuming that Ocwen keeps assets in Massachusetts (Docket Entry # 57-7, ¶ 23) (Docket Entry # 57-2, ¶ 4), a demand letter is not required if Ocwen does not maintain a place of business in Massachusetts on or shortly prior to November 29, 2015.  See Moronta v. Nationstar Mortg., LLC, 64 N.E.3d at 1289 (explaining that plaintiff does not need to send demand letter if defendant does not maintain a place of business in Massachusetts and does keep assets in the state).  Because it remains a genuine issue of material fact as to whether Ocwen maintains a place of business on or shortly prior to November 28, 2015, summary judgment in Ocwen's favor on the chapter 93A claim due to the absence of a pre-suit demand letter is not appropriate.

B.  Remaining Chapter 93A Arguments

Turning to defendants' remaining argument vis-à-vis the chapter 93A claim, they seek summary judgment because the chapter 93A claim is based on the same, insufficient allegations as the fraud claim.  Because Ocwen is entitled to summary judgment on the fraud claim, it is entitled to summary judgment on chapter 93A claim, according to defendants.[16]  (Docket Entry #

---

that Ocwen did not maintain a place of business during that time period.  (Docket Entry # 57-7, ¶ 23).

[16]  Because DBNTC as Trustee is entitled to summary judgment on the chapter 93A claim due to the absence of a demand letter, this court addresses the remaining arguments only as they apply to Ocwen.

56, p. 15) (citing Guillaume v. Wells Fargo Home Mortg. Corp.,

Civil Action No. 12-12176-NMG, 2014 WL 2434650, at *4 (D. Mass.

May 30, 2014), which "dismiss[ed] plaintiffs' Chapter 93A claim

because it is based entirely on the discredited claim of

fraudulent misrepresentation").  Inasmuch as this court is *not*

recommending the dismissal of the fraud claim in its entirety,

the argument does not result in a dismissal of the chapter 93A

claim against Ocwen.

Defendants additionally argue that plaintiffs fail to

identify any facts that demonstrate that Ocwen's conduct is

unfair or deceptive.  (Docket Entry # 56, pp. 15-16).

Plaintiffs assert that the alleged conduct of "'false and

deceptive billing' by Ocwen "in order to gain a monetary

advantage falls within the reach "of unscrupulous, unethical and

immoral" conduct under chapter 93A.  (Docket Entry # 58, p. 11).

As previously noted, the chapter 93A claim relies on the same,

three instances of misconduct as the fraud claim.  The first

category or incident concerns the purported misrepresentation of

the principal balance of the loan between December 2006 and

January 2011 and in the 2011 HAMP Agreement.  (Docket Entry #

46, ¶ 42(a)).  For reasons stated in Roman numeral III, any

misrepresentation during this time period regarding the

principal balance is untimely.  The second category rests on the

mathematical inaccuracies of the principal balance in the 2014

Modification Agreement and "every month thereafter" as false and intentionally misrepresented because Rodrigues made 41 monthly payments between January 2011 and July 2014. (Docket Entry # 46, ¶ 42(b)). The third category concerns the false and inaccurate representation of the $185,996.85 balloon payment in the loan history, which, as noted, does not reflect all of the aforementioned 41 payments. (Docket Entry # 46, ¶ 42(c)).

Chapter 93A "proscribes 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" Juarez v. Select Portfolio Servicing, Inc., 708 F.3d at 280 (quoting chapter 93A, section 2). "'[A]n act or practice is unfair if it falls "within at least the penumbra or some common-law, statutory, or other established concept of fairness"; "is immoral unethical, oppressive, or unscrupulous"; and "causes substantial injury to consumers."'" Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 34 (1st Cir. 2016) (quoting Walsh v. TelTech Sys., Inc., 821 F.3d 155, 159-60 (1st Cir. 2016)). "[A]n act or practice is deceptive 'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Walsh v. TelTech Sys., Inc., 821 F.3d at 160 (quoting Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 486-87 (Mass. 2004)). The SJC "has repeatedly held that 'mere negligence,' standing alone, is not sufficient for a

violation of ch. 93A—something more is required." Baker v.
Goldman, Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014) (citing
Massachusetts cases including Swanson v. Bankers Life Co., 450
N.E.2d 577, 580 (Mass. 1983)).  In Marram v. Kobrick Offshore
Fund, Ltd., 809 N.E.3d 1017, 1032 (Mass. 2004), "the SJC
described that 'something more' as 'extreme or egregious'
negligence." Baker v. Goldman, Sachs & Co., 771 F.3d at 51; see
Walsh v. TelTech Sys., Inc., 821 F.3d at 160 (explaining that
unfair act or practice "must generally be of an egregious, non-
negligent nature").  In order to succeed on the claim, a chapter
93A plaintiff "must demonstrate more than "[a] mere breach of
contract," but rather must show misconduct "ris[ing] to the
level of 'commercial extortion' or a similar degree of culpable
conduct." Commercial Union Ins. Co. v. Seven Provinces Ins.
Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000).  Finally, "[c]ommon
law fraud can be the basis for a claim of unfair or deceptive
practices under" chapter 93A. McEvoy Travel Bureau, Inc. v.
Norton Co., 563 N.E.2d 188, 194 (Mass. 1990)).

     Viewing the facts in plaintiffs' favor, Rodrigues made 41
payments between January 2011 and the 2014 Modification
Agreement.  Ocwen, however, credited only 28 payments during
this time period.  A reasonable jury could find that Ocwen's
failure to credit more than a quarter of plaintiffs' payments
constitutes more than mere negligence.  Rather, it provides a

basis for the jury to find extreme or egregious negligence as well as knowing breaches of the 2011 HAMP Agreement.  The second category of deceptive misrepresentations based on the 41 payments Rodrigues made between January 2011 and July 2014 as well as the inflated principal balance in the 2014 Modification Agreement (Docket Entry # 46, ¶ 42(b)) is therefore not subject to summary judgment based on defendants' third argument.[17]

As a final argument, defendants submit that plaintiffs fail to demonstrate an economic injury caused by the chapter 93A violation based on their argument concerning the absence of causation to support the fraud claim.  (Docket Entry # 56, p. 16).  More specifically, plaintiffs maintain they "alleged an injury that should be considered true for purposes of summary judgment" (Docket Entry # 58, p. 11) and elsewhere set out the injury and causation with respect to the fraud claim (Docket Entry # 58, pp. 9-10).

The First Circuit in Shaulis discusses at length the history and the SJC's current view of the injury component of a chapter 93A claim.  Finding no cognizable injury for the chapter 93A claim, the Shaulis court summarily affirmed the lower

---

[17]  It is not necessary to address the above argument with respect to the chapter 93A claim based on the estimated balloon payment (Docket Entry # 46, ¶ 42(c)) because plaintiffs fail to satisfy the injury component of a chapter 93A claim, as discussed below.

court's dismissal of a fraudulent misrepresentation claim for
the same reason, namely, a failure to set out an actionable,
pecuniary injury.  Shaulis v. Nordstrom, Inc., 865 F.3d at 15.
The plaintiff in Shaulis purchased a sweater based on a price
tag with a purchase price of $49.97 and a purportedly false
statement of a "Compare at Price" of $218.  Id. at 5, 12.  The
higher, "Compare At" price purported to represent the sweater as
having a high quality.  Id. at 12.  The plaintiff did not allege
she received less than what she paid for the sweater or that she
received an objectively inferior quality sweater "manufactured
with 'shoddy materials.'"  Id. at 12.  Overall, she did not
identify an injury separate from the deceptive practice of the
false representation of the inflated or higher quality of a
$49.97 sweater with the "Compare At" price of $218.  Id. at 12-
14.

     Here too, plaintiffs do not identify an injury separate
from the deception of the false representation of the estimated
balloon payment based on the inflated principal.  Plaintiffs did
not expend any money to pay the balloon payment.  Their theory
of an injury based on the inflated, estimated balloon payment
amount is no different from the false representation of the
inflated quality of the sweater in Shaulis as worth $218.  The
First Circuit in Shaulis explains the crux of the distinction
between an actionable chapter 93A economic injury and a

deficient injury that rests only on the deceptive practice in

the following manner:

> To state a viable claim, the plaintiff must allege that she
> has suffered an "identifiable harm" caused by the unfair or
> deceptive act that is separate from the violation itself.
> Tyler, 984 N.E.2d at 745.  Put another way, a plaintiff
> must "show 'real' economic damages," as opposed to some
> speculative harm.  Rule II, 607 F.3d at 253.  Accordingly,
> a claim that alleges only a "per se" injury—that is, a
> claim resting only on a deceptive practice, regulatory
> noncompliance, or the "impairment of an abstract right
> without economic loss"—is insufficient to state a Chapter
> 93A claim.  Id.; see also Tyler, 984 N.E.2d at 745-46.  *It
> is thus not enough to claim that the defendant's improper
> conduct created a risk of "real economic damages."*  Rule
> II, 607 F.3d at 253 (internal quotation marks omitted).
> Speculation concerning still inchoate harm does not
> establish the distinct injury that "is an essential
> predicate for recovery under" Chapter 93A.  Bellermann, 54
> N.E.3d at 1113 (quoting Hershenow, 840 N.E.2d at 528); see
> also Rule II, 607 F.3d at 253.  Instead, legally cognizable
> injuries under Chapter 93A must involve objective,
> "identifiable" harm that goes beyond the deception itself.
> Tyler, 984 N.E.2d at 745; Iannacchino, 888 N.E.2d at 888.

Shaulis v. Nordstrom, Inc., 865 F.3d at 10 (emphasis added).

The risk of plaintiffs experiencing an economic injury in the

form of making a payment of the balloon amount in the future is

not enough to satisfy the injury component of chapter 93A.  The

chapter 93A claim against Ocwen based on the misrepresentation

of the balloon payment amount is therefore subject to summary

judgment.

Turning to the chapter 93A claim based on the 41 payments

Rodrigues made and the inflated principal in the 2014

Modification Agreement (Docket Entry # 46, ¶ 42(c)), plaintiffs

provide evidence that Rodrigues made 41 payments whereas the
loan history records only 28 payments during the aforementioned
time period.  As explained in Roman numeral I with respect to
the fraud claim, a jury could find that Ocwen's failure to
credit the additional payments caused plaintiffs the economic
injury of paying more than they owed based on the inflated
interest and principal amount in a number of monthly statements.
This chapter 93A claim (Docket Entry # 46, ¶ 42(b)) as to Ocwen
therefore survives summary judgment.

III.  <u>Statute of Limitations</u>

    Defendants also move for summary judgment on all claims
based on the 2011 HAMP Agreement, asserting that the claims are
time barred under the respective three and four-year statutes of
limitations for common law fraud and chapter 93A.  (Docket Entry
# 56).  Plaintiffs filed this action on December 28, 2015
(Docket Entry # 1), more than four years after the January 2011
HAMP Agreement.  Plaintiffs argue that the "delayed discovery
rule" tolls the limitations periods.  (Docket Entry # 58).  In
particular, they assert that the statutes of limitations did not
begin to run until 2015 when they "uncovered defendants'
fraudulent actions" through an investigation.  (Docket Entry #
58).  Citing California state law, plaintiffs contend that a
cause of action may only accrue under the discovery rule "when
the plaintiff has some reason to suspect an injury and some

43

wrongful cause" that could be uncovered through "a reasonable investigation of all potential causes of the injury." (Docket Entry # 58) (citing Fox v. Ethicon Endo-Surgery, Inc., 110 P.3d 914, 920 (Cal. 2005), and United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 463 P.2d 770, 776 (Cal. 1970)).

The Massachusetts discovery rule tolls "a limitations period until a prospective plaintiff learns or should have learned that he has been injured." Albrecht v. Clifford, 767 N.E.2d 42, 49 (Mass. 2002); accord Creative Playthings Franchising Corp. v. Reiser, 978 N.E.2d 765, 770 (Mass. 2012). Under the rule, the accrual of the cause of action occurs "'when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'" In re Sheedy, 801 F.3d 12, 20 (1st Cir. 2015). The rule "may arise in three circumstances:  where a misrepresentation concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive." Albrecht v. Clifford, 767 N.E.2d at 49; accord Creative Playthings Franchising Corp. v. Reiser, 978 N.E.2d at 770. "The factual basis for a cause of action is inherently unknowable if it is incapable of detection by the wronged party through the exercise

of reasonable diligence." Geo. Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210, 213 (1st Cir. 1999) (internal quotation marks omitted).

In applying the discovery rule to allegations of unfair, deceptive, or otherwise fraudulent mortgage practices, claims generally accrue at the closing of the sale because this is the moment at which the mortgagor "'should reasonably have discovered' the harmful terms of the loan." Galgana v. Wells Fargo Bank, N.A., Civil Action No. 17-01924-MLW, 2018 WL 1542055, at *1, 3 (D. Mass. Mar. 29, 2018); see, e.g., In re Sheedy, 801 F.3d at 20-21 (holding that chapter 93A claim based on 2004 mortgage loan accrued when transaction closed in April 2004 and therefore expired in April 2008); Salois v. Dime Sav. Bank of N.Y., 128 F.3d 20, 24-25 (1st Cir. 1997) (holding that claims accrued when plaintiffs signed loan contracts because lender did not conceal from plaintiffs the facts giving rise to her claim of predatory lending; rather, the "[loan] documents contained all of the information necessary to determine" the interest rate on the loan).

Here, plaintiffs' claim for common law fraud has a three-year statute of limitations, while their chapter 93A claim has a four-year statute of limitations. See Mass. Gen. Laws ch. 260, § 2A; Skarzynski v. U.S. Bank NA, Civil Action No. 18-30052-MGM, 2018 WL 2247240, at *3 (D. Mass. May 16, 2018) ("statute of

limitations requires that actions alleging fraud be brought within 'three years next after the cause of action accrues'") (citing Mass. Gen. Laws ch. 260, § 2A); Mass. Gen. c. 260, § 5A (setting out four-year statute of limitations for chapter 93A claims).  In reviewing the mortgage modification documents, account statements, and other materials evidencing the terms and conditions of plaintiffs' mortgage, there is nothing to indicate that plaintiffs could not detect the misconduct through reasonable diligence.  See Salois v. Dime Sav. Bank of N.Y., 128 F.3d at 24-25.  For instance, the 2011 HAMP Agreement contains specific information on the new principal balance that plaintiffs would owe under the newly modified note.[18]  (Docket Entry # 57-8, p. 6).  Moreover, the 2011 HAMP Agreement even included a detailed payment schedule that explicated the interest rates and sums of monthly payments that would be due in each subsequent year of the mortgage agreement.[19]  (Docket Entry

---

[18]  The 2011 HAMP Agreement states that the "New Principal Balance" due under the newly modified loan would be $482,140.53. (Docket Entry # 57-8, p. 6).  After factoring a "Deferred Principal Balance" of $9,9000, the "Interest-Bearing Balance" totaled $472,240.53.  (Docket Entry # 57-8, p. 6).
[19]  The payment schedule notes that for years one through five, plaintiffs would owe $1,430.07 each month at 2.00% interest. For year six, plaintiffs would owe $1,661.40 each month at 3.00% interest.  For year seven, plaintiffs would owe $1,905.59 each month at 4.00% interest.  For year eight until maturity, plaintiffs would owe $1,999.43 each month at 4.375% interest. (Docket Entry # 57-8 p. 6).

# 57-8, p. 6).  Along with the 2011 HAMP Agreement, Ocwen also provided an account statement that alerted plaintiffs to their outstanding principal, interest, and escrow amounts due prior to the modification.  (Docket Entry # 57-8, p. 1).  Given the volume of detailed information that Ocwen provided plaintiffs leading up to the 2011 HAMP Agreement's execution, plaintiffs should have reasonably discovered any potential injuries that the modification posed at the time it was issued and that they were harmed or may have been harmed by defendants.  See Salois v. Dime Sav. Bank of N.Y., 128 F.3d at 24-25; Galgana v. Wells Fargo Bank, N.A., 2018 WL 1542055, at *3.  Because the modification documents contained all of the necessary information pertaining to the nature of the loan, the purportedly false principal amount in the 2011 HAMP Agreement was not inherently unknowable.  See Salois v. Dime Sav. Bank of N.Y., 128 F.3d at 24-25.  Thus, the fraud and chapter 93A claims based on the 2011 HAMP Agreement are time barred under their respective three and four-year statutes of limitations.[20]  See id.

---

[20]  Plaintiffs have not set forth any evidence in the summary judgment record that defendants breached their duty to disclose, nor have they set forth any facts indicating that Ocwen or DBNTC as Trustee took affirmative actions to conceal a cause of action with the intent to deceive.  Thus, the other two situations in which the discovery rule could apply are not pertinent to the circumstances of this case.

CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[21] that the motion for summary judgment (Docket Entry #

55) be **ALLOWED** as to:  the fraud claims (Count I) against

defendants in paragraphs 33(a) and 33(c) of the amended

complaint; the chapter 93A claim (Count II) against defendants

in paragraphs 42(a) and 42(c) of the amended complaint; and the

fraud and chapter 93A claims in paragraphs 33(b) and 42(b) of

the amended complaint against DBNTC as Trustee.  This court also

**RECOMMENDS**[22] that the summary judgment motion (Docket Entry # 55)

be **DENIED** as to the fraud claim against Ocwen in paragraph 33(b)

of the amended complaint and the chapter 93A claim against Ocwen

in paragraph 42(b) of the amended complaint.  (Docket Entry #

46).


                              /s/ Marianne B. Bowler
                         **MARIANNE B. BOWLER**
                         United States Magistrate Judge

---

[21]  Any objections to this Report and Recommendation must be
filed with the Clerk of the Court within 14 days of receipt of
the Report and Recommendation to which objection is made and the
basis for such objection.  See Fed. R. Civ. P. 72(b).  Any party
may respond to another party's objections within 14 days after
service of the objections.  Failure to file objections within
the specified time waives the right to appeal the order.
[22]  See previous footnote.